UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TENNESSEE CLEAN WATER )
NETWORK, *et al.*, )
)
        Plaintiffs, )
)
v. )    No.:  3:05-CV-214
)          (VARLAN/GUYTON)
GALE A. NORTON, *et al.*, )
)
        Defendants. )

## <u>MEMORANDUM OPINION</u>

This civil action under the National Environmental Policy Act ("NEPA") challenges

certain decisions of the United States Department of the Interior Office of Surface Mining,

Reclamation and Enforcement ("OSM") related to coal mining permit number 3154 issued

to the National Coal Corporation ("NCC") to conduct mining operations in Campbell and

Scott Counties, Tennessee. Plaintiffs have asserted 15 counts under NEPA and one count

under the Surface Mining, Control and Reclamation Act ("SMCRA"). The Court notes that

this is the second lawsuit which has challenged OSM's actions related to this mining

operation, with the first case, *Save Our Cumberland Mountains, et al. v. Gale Norton, et al.*,

No. 3:03-CV-462, now pending on appeal at the Sixth Circuit.

This case is before the Court on three pending motions: the plaintiffs' Motion for

Preliminary Injunction [Doc. 2]; the defendants' Motion to Strike Extra-Record Evidence

[Doc. 46]; and the defendants' Motion for Partial Dismissal [Doc. 48]. The parties have filed

exhaustive briefs and materials relating to the pending motions [*see* Docs. 3, 17, 47, 49, 52,

53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 69, 82, 87, 88, 91, 92, 94, 95, 100, 102, 105, 106, 114]. The Court has carefully considered all of these materials and the arguments of counsel presented on August 24, 2005.

For the reasons set forth herein, the plaintiffs' motion for preliminary injunction will be denied, the defendants' motion for partial dismissal will be granted, and the defendants' motion to strike will be denied.

## I.      Background

Plaintiffs are five non-profit organizations, Tennessee Clean Water Network, the Sierra Club, Appalachian Voices, the Southern Appalachian Biodiversity Project, and Save Our Cumberland Mountains, who are challenging certain decisions of OSM related to mining permit number 3154 issued to defendant National Coal Corporation. The federal defendants are Gale A. Norton, the Secretary of the Department of the Interior, Jeffrey D. Jarrett, the Director of OSM, and Tim Dieringer, the Director of OSM's Knoxville Field Office.

As noted in the previous case, OSM issued permit number 3116 to Robert Clear Coal Corporation on June 30, 2003, to conduct contour, cross-ridge, and auger coal mining operations on Zeb Mountain. Permit 3116 was issued along with an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI"). It is worth noting that the issuance of the initial permit, EA, and FONSI are not at issue in this case. The initial mining permit issued to Robert Clear Coal Corporation ("RCCC") was transferred to NCC on November 8, 2004, as successor-in-interest permit number 3154.

On December 6, 2004, OSM issued a revised successor-in-interest permit which included several special conditions, including condition 17d. Special condition 17d, which is the focus of plaintiffs' SMCRA claim, states as follows:

> Completion and implementation of OSM Permit No. 3116, Ordered Revision No. 3, Revision of Drainage Control Plan for Dan Branch Watershed, before mining activities resume.

[Doc. 53, Ex. B.] OSM subsequently determined that special condition 17d was an administrative error and should not have been included in the revised transfer document. OSM attempted to correct the error by revising the document on March 3, 2005. The transfer decision had been administratively appealed and the presiding Administrative Law Judge ("ALJ") determined that OSM could not amend the decision while it was on appeal. Thus, on June 23, 2005, the ALJ remanded the transfer decision to OSM to permit the revision of special condition 17d. On June 30, 2005, OSM revised and reissued the permit transfer decision without special condition 17d.

Plaintiffs' NEPA claims relate to OSM's approval of two revisions to NCC's permit, Revision 3 and Revision 1. Revision 3 relates primarily to OSM's order for RCCC, now NCC, to revise the drainage control plan for the Dan Branch watershed. Revision 3 proposes the following actions:

> This revision authorizes changes to the drainage control plan in the Dan Branch watershed portion of the permit area. These changes include: (1) the construction of two new temporary sediment basins (DNB-7 and DNB-8), a temporary sediment trap, and temporary pipeline and diversion ditch to provide sediment control for run-off from a portion of Haulroad No. 1 and an existing landslide; (2) the temporary use of flocculent and coagulant products to treat water in the sediment basins; (3) construction of a rock buttress and the

3

associated relocation of a portion of Dan Branch in order to stabilize an existing landslide; (4) stabilizing basin DNB-3 spillway to prevent further erosion; (5) the addition of two permanent sediment basins (DNB-5 and DNB-6) on the mine bench area to improve sediment control from the mining area; and (6) minor modifications to the construction plans for various previously approved basins in the Dan Branch watershed. This revision necessitates an incidental change to the permit boundary adding an additional 19.6 acres to the permit area of which 15.6 acres would be disturbed.

[AR at REV3-0067.][1]  On February 16, 2005, OSM issued its Findings, a Supplemental Cumulative Hydrologic Impact Assessment ("SCHIA"), a Supplemental EA ("SEA"), and FONSI relating to Revision 3.

Revision 1 relates to OSM's order for re-evaluation of the approved drainage control plans for the remaining watersheds within the permitted area. On March 23, 2005, OSM approved Revision 1 as a "minor revision that will not result in any additional environmental impacts." [AR at REV1-0010 to -0011.] Plaintiffs Tennessee Clean Water Network and Sierra Club administratively appealed the approval of Revision 1, and that appeal was pending at the time of the briefings and oral argument on the motions. On September 16, 2005, while these motions were under advisement, plaintiffs filed a notice that the administrative appeal of Revision 1 was voluntarily dismissed on or about August 27, 2005 [Doc. 114]. The Court observes that, despite plaintiffs' objections to them, both Revision 3 and Revision 1 are designed to minimize the adverse impacts of the mining to the environment.

---

[1]The cited portions of the administrative record have been filed as attachments to the federal defendants' response in opposition to the motion for preliminary injunction [Doc. 69].

The Court will first address defendants' pending motion for partial dismissal and motion to strike as the resolution of those issues affects the scope of review of plaintiffs' motion for preliminary injunction.

## II.    Defendants' Motion for Partial Dismissal

### A.    Count XIII, Revision No. 1

The federal defendants moved, pursuant to Fed. R. Civ. P. 12(b)(1), for an order dismissing Counts I and XIII of plaintiffs' complaint for lack of subject matter jurisdiction. [Doc. 48.]  Defendants argued that the Court does not have jurisdiction over Count XIII, which relates to permit Revision No. 1, because there is no final agency decision for Revision No. 1 and it is still on administrative appeal.  Thus, there is no final agency action for this Court to review.  *See* 5 U.S.C. § 704.  Plaintiffs' initial response indicated that they were willing to voluntarily dismiss this claim without prejudice [Doc. 88 at p. 2].  Plaintiffs did not do so.  Subsequently, after the briefing and oral argument on this issue, the plaintiffs filed a notice indicating that they had voluntarily dismissed the administrative appeal of Revision 1 on or about August 27, 2005 [Doc. 114].  Thus, contrary to their earlier position, plaintiffs now assert that the approval of Revision 1 is a final agency action and reviewable by this Court.

Plaintiffs' actions cannot reasonably be construed to constitute administrative exhaustion.  Plaintiffs have chosen to forego the agency's review of Revision 1, thereby defeating the purpose of administrative exhaustion.  As explained by the Sixth Circuit,

> Administrative exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review. The administrative exhaustion doctrine exists to permit an administrative agency to apply its special expertise in interpreting relevant statutes and in developing a factual record without premature judicial intervention.

*Arctic Express, Inc. v. United States Dep't of Transp.*, 194 F.3d 767, 769 (6th Cir. 1999) (internal quotations and citations omitted). Plaintiffs' maneuvering of the record also appears to be an attempt to short-circuit the "record review" standard of NEPA cases and to invite premature judicial oversight of this coal mining operation. The Court declines such an invitation and finds that plaintiffs have not exhausted their administrative remedies for Revision 1. Therefore, the defendants' motion to dismiss Count XIII of the complaint will be granted, and that claim will be dismissed without prejudice.

B.    Count I, SMCRA Claim

Count I, plaintiffs' only SMCRA claim, alleges that OSM has failed to enforce special condition 17d as set forth in the revised successor-in-interest permit issued December 6, 2004 [Doc. 1 at ¶¶ 120-124]. As defendants point out, a motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges the Court's subject matter jurisdiction, *i.e.*, the Court's power to hear the claim. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). A plaintiff bears the burden of proving that jurisdiction does in fact exist. *Id*. The defendants argue that the Court does not have jurisdiction over Count I because the permit transfer decision has been revised and reissued as of June 30, 2005, and special condition 17d

no longer exits.  Alternatively, the defendants argue that the plaintiffs have failed to comply with the notice provisions of 30 U.S.C. § 1270(b)(2).  The plaintiffs assert that Count I is properly before the Court for review.

As set forth in the Declaration of Douglas K. Siddell, a Supervisory Program Specialist with OSM's Knoxville Field Office, OSM issued its original permit transfer decision document on November 8, 2004 [Doc. 53 at ¶ 3].  Special condition 17d was not included in the original decision document.  Special conditions 17b and 17c were included in the original document to make clear that NCC, as successor-in-interest to Robert Clear Coal Corporation, was responsible for abating the outstanding violations issued to RCCC. Mr. Sidell states that the original permit decision should also have included a special condition 17d to clarify that NCC was responsible for submitting necessary information to obtain approval for Revision 3.  [*Id*. at ¶ 4.]

Mr. Siddell states that the omission of special condition 17d related to Revision 3 was later recognized by a KFO Technical Group staff person responsible for processing the transfer application, and the decision document was subsequently revised on December 3, 2004, to include special condition 17d as follows:

> Completion and implementation of OSM Permit No. 3116, Ordered Revision No. 3, Revision of Drainage Control Plan for Dan Branch Watershed, before mining activities resume.

[*Id*. at ¶ 5; Ex. B.]  The phrase "before mining activities resume" is the disputed language in special condition 17d.

7

Mr. Siddell was absent from the KFO due to illness from early November through early December 2004. Upon his return, Mr. Siddell received a citizen's complaint dated December 10, 2004, which requested enforcement of special condition 17d. [*Id.* at ¶ 6.] Mr. Siddell determined that special condition 17d was an administrative error because under the Tennessee regulatory program, including 30 C.F.R. § 843.11, OSM had no regulatory or factual basis to require NCC to stop mining pending processing and implementation of Revision 3. [*Id.* at ¶ 7.] It is undisputed that mining had never ceased under Permit No. 3116; thus, Siddell concluded there was not basis in fact to include in special condition 17d a reference to resumption of mining. Nor was there any regulatory or factual basis upon which OSM could order mining to cease. [*Id.* at ¶ 8.]

Because OSM had no basis under SMCRA to require cessation of mining pending processing and implementation of Revision 3, OSM initially attempted to correct the administrative error by revising the decision document on March 3, 2005. [*Id.* at ¶ 9.] However, the December 3, 2004 permit transfer decision had been administratively appealed by the Sierra Club and Tennessee Clean Water Network, two of the plaintiff organizations. [Doc. 52, Dieringer Dec. at ¶ 3.] The ALJ before whom the appeal of the transfer decision was pending determined that OSM could not amend the decision while it was on appeal, and on June 23, 2005, the ALJ remanded the transfer decision to OSM to permit OSM to revise special condition 17d. [*Id.* at ¶ 4.] On June 30, 2005, OSM revised and reissued the permit transfer decision, and special condition 17d no longer exists. [*Id.* at ¶ 5.] Thus, defendants argue that this claim is moot and should be dismissed.

8

In response, the plaintiffs argue that the Court does have jurisdiction over the claim regarding special condition 17d because OSM had both the regulatory and factual basis to halt mining pending processing and implementation of Revision No. 3. [Doc. 88.] However, as pointed out by defendants' reply brief, and contrary to plaintiffs' assertions, there is no competent evidence in the record that OSM ever ordered mining to cease in the Dan Branch watershed prior to the addition of special condition 17d. [*See* Doc. 105 at pp. 4-5.]

Plaintiffs also argue that OSM cannot moot the issue by simply labeling it an "administrative error" and deleting it from the permit without public participation. [Doc. 88.] Plaintiffs contend this is an issue "capable of repetition, yet evading review" such that the defendants' claim of mootness does not apply. Specifically, plaintiffs argue that OSM is attempting to evade judicial review by making a major revision to the SMCRA permit without the requisite public review and comment periods [*Id.* at p. 6].

Defendants respond that the June 30, 2005 revised permit transfer decision is not before the Court and therefore the plaintiffs may not challenge OSM's authority to issue that decision. Additionally, the defendants contend that the revision to the permit transfer decision was not a revision to the permit itself because it was not a revision to the reclamation or mining plan. [Doc. 105.]

The SMCRA regulations provide that "[a] significant revision to the mining or reclamation plan will be subject to the permit application information requirements and procedures ... including notice, public participation, and notice of decision requirements ... prior to approval and implementation." 30 C.F.R. § 942.774(c). The Court agrees with

9

defendants' position that the revision to the permit transfer decision which eliminated special condition 17d was not a revision to the "mining or reclamation plan." Moreover, the Court can find no reason why OSM should be precluded from correcting what was obviously an error and removing a prerequisite which never should have been added.[2]

Accordingly, for all of these reasons, the Court finds that the defendants' motion for partial dismissal is well-taken and it will be granted and Count I of plaintiffs' complaint will be dismissed.

## III.    Defendants' Motion to Strike Extra-Record Evidence

The federal defendants have filed a motion to strike certain exhibits filed by the plaintiffs in support of their motion for preliminary injunction as well as to strike references to these exhibits in plaintiffs' supporting briefs. [Doc. 46.] The defendants contend that the offending exhibits are not part of the administrative record ("AR") under review and also that some of the exhibits contain hearsay and/or improper expert opinion. After the initial motion was filed and after plaintiffs responded to the motion, the defendants have altered their position somewhat, namely as to which exhibits they are objecting. As the Court now

_____

[2]Defendants also argue that the Court lacks jurisdiction over Count I because the plaintiffs did not give 60-days notice of intent to sue and they cannot show that they are excepted from this requirement pursuant to 30 U.S.C. § 1270(b)(2). Although they do not dispute that the notice was sent less than 60 days prior to filing suit, plaintiffs respond that they have satisfied each of the necessary elements for such notice and the exception thereto. While the Court questions whether the plaintiffs can satisfy the exception to the 60-day notice requirement, the Court need not address this issue in light of the conclusion above.

understands the parties' positions, defendants object to the following exhibits submitted by the plaintiffs: 2, 15, 27, 28, 29, 30, 31, 32, 38A, 40, 41, 42, 43 [*see* Doc. 94]. Moreover, at the oral argument hearing on August 24, 2005, counsel for the federal defendants urged the Court to take action to "get the exhibit filing under control" and to require plaintiffs to seek leave of the Court before filing any future exhibits.

The plaintiffs respond that they have to present extra-record evidence to show the irreparable injury to the human environment, one of the factors necessary for issuance of a preliminary injunction, although the legal basis for this assertion is unclear [Doc. 92]. Plaintiffs point out that both the federal defendants and NCC have submitted extra-record evidence, and particularly that NCC has submitted numerous affidavits related to extra-record evidence of alleged economic harm if a preliminary injunction were issued. Plaintiffs also cite to many cases regarding exceptions to the "record rule," *i.e.*, situations when the Court should consider evidence beyond that contained in the AR. Thus, the implication is that this case falls within one of the exceptions and the plaintiffs' exhibits should be considered.

It is worth reiterating that this Court's review, pursuant to NEPA and the Administrative Procedures Act ("APA"), is a review of the administrative record. 5 U.S.C. § 706(2)(A). Specifically, the Court is to review the "administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The administrative record consists of all the materials compiled by the agency that were before the agency at the time of the decision at issue. *Sierra Club v. Slater*,

11

120 F.3d 623, 638 (6ᵗʰ Cir. 1997). Supplementation of the administrative record may be appropriate "when an agency deliberately or negligently excludes certain documents, or when the court needs certain 'background information in order to determine whether the agency considered all of the relevant factors.'" *Id.* (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1077 (1997)); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6ᵗʰ Cir. 1991) ("a reviewing court evaluating agency action on the administrative record may consider additional evidence as either background information to aid the court's understanding, or to determine if the agency examined all relevant factors or adequately explained its decision"). Supplementation of the record may also be permitted if the plaintiff has made a strong showing of bad faith on the part of the agency. *Slater*, 120 F.3d at 638; *Charter Twp. of Van Buren v. Adamkus*, 188 F.3d 506, 1999 WL 701924 at *4 (6ᵗʰ Cir. Aug. 30, 1999). Such situations are generally considered to be "exceptional circumstances." *Charter Twp. of Van Buren*, 1999 WL 701924 at *4.

Although it seems to be a simple, straightforward principle that the Court's review is governed by the "record rule," the scope of what the Court may consider has generated ongoing controversy in this case and the prior case. It appears that the plaintiffs, perhaps encouraged by a lack of specificity in the case law, are blurring the distinction between two separate concepts: supplementing the AR with materials that were available to and considered by the agency and thus should have been included in the AR versus consideration by the Court of materials in addition to the AR. The plaintiffs have not asked that the

12

disputed exhibits be added to the AR, nor does it appear that such a request would be appropriate. The plaintiffs have not alleged that the disputed exhibits were considered by OSM and omitted from the AR or that OSM failed to consider documents available to it at the time of the decision. Several of the disputed exhibits are affidavits and would not be part of the AR in any event. While the plaintiffs generically raise the specter of defendants' "bad faith," it is clear that such an allegation requires a "strong showing," and the Court finds that plaintiffs have not met this burden.

The Court notes that most of the exhibits complained of were filed by plaintiffs at the same time as the complaint and the motion for preliminary injunction were filed [Doc. 3]. The exhibits are not labeled with a citation to the AR, nor has any comprehensive cross-reference list been provided to the Court, *i.e.*, matching the plaintiffs' exhibit number with a corresponding reference to the AR to the extent the materials are part of the AR. The plaintiffs' method of providing such documentation to the Court is confusing and not helpful. The Court would prefer that, in a record review case such as this, the parties file the complete AR and cite to it consistently.

The defendants' arguments that many of plaintiffs' exhibits post-date the NEPA decision at issue and/or contain hearsay or improper expert opinion are noted and well-taken. However, the Court may assess the value of such evidence in reviewing the merits of the issues presented. The defendants' proposal that the Court excise the numerous offending exhibits and references to those exhibits from the record would be a monumental task and

13

one which the Court concludes is unnecessary in this litigation. The defendants' motion to strike will therefore be denied.

## IV.     Plaintiffs' Motion for Preliminary Injunction

Plaintiffs' motion for preliminary injunction requests the Court to order "that the mining permit be revoked or suspended pending a full environmental impact statement and that all mining cease pending 'completion and implementation of OSM Permit No. 3116, Ordered Revision No.3', in compliance with Special Condition 17d Successor-in Interest Permit No. 3154. In the alternative, Plaintiffs request that the permit be suspended and that approval of Revision No. 1 be revoked pending a full EIS for the entire mining site and that all mining cease pending 'completion and implementation of OSM Permit No. 3116, Ordered Revision No. 3', until such time as Defendants have fully complied with the National Environmental Policy Act and the full environmental impacts of this massive coal mining operation have been studied." [Doc. 2 at pp. 2-3.] In light of the Court's ruling on the motion for partial dismissal, *supra*, the merits of plaintiffs' motion for preliminary injunction will relate solely to OSM's approval of Revision 3.

Both the federal defendants and NCC argue that plaintiffs' motion for preliminary injunction should be denied. The federal defendants argue that plaintiffs cannot show that OSM's approval of Revision 3 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. NCC argues that the motion should be denied for many of the same reasons as the dismissal of the first lawsuit, particularly that plaintiffs cannot show a

14

strong likelihood of success on the merits of their NEPA claims or that they will be irreparably harmed by OSM's approval of Revision 3. NCC also strongly argues that shutting down the mining operation would cause substantial harm to the company, its employees and vendors, and that the public interest would not be served by cessation of mining. Plaintiffs respond that irreparable environmental injury has already occurred and further harm is threatened by the foreseeable impacts of the mining operation. Plaintiffs also argue that any economic impact of an injunction is outweighed by the harm to the public and the environment.

A.    Standard of Review

The parties agree that this Court has jurisdiction to review NEPA claims pursuant to the Administrative Procedure Act, 5 U.S.C. § 704.[3] The federal defendants, in particular, point out that the Court's review of a federal agency decision under the APA is a review of the administrative record and a determination, based on the administrative record, of whether that decision was arbitrary and capricious. 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, finding, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). *See Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir.), *cert. denied*, 506 U.S. 953 (1992)

---

[3]"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Issuance of an environmental assessment, here the SEA, constitutes a "final agency action" for purposes of review under the Administrative Procedure Act. *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001).

("agency decisions are set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); *Slater*, 120 F.3d at 632 (same). As the federal defendants point out, this is a deferential standard of review that presumes the validity of agency actions. *See Chemical Mfrs. Ass'n v. National Resources Defense Council, Inc.*, 470 U.S. 116, 131 (1985).

The parties agree that the Court should consider four criteria in assessing whether to issue a preliminary injunction. The Court must consider: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001) (quoting *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)). Upon review of the record, the Court concludes that plaintiffs cannot satisfy the first factor, that is, likelihood of success on the merits.

NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321; *Southwest Williamson County Cmty. Ass'n, Inc.*, 243 F.3d at 278. NEPA does not mandate a specific result; NEPA requires only that the agency follow the necessary process in assessing the environmental effects of such projects. *Robertson v.*

16

*Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-228 (1980) ("once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'").

NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Southwest Williamson County Cmty. Ass'n*, 243 F.3d at 274 n.3. The NEPA regulations specifically provide that an agency may first prepare an environmental assessment ("EA"), a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. Thus, the regulations instruct that an agency, after preparation of an EA, may either prepare an EIS *or* a FONSI. In the present case, the SEA led OSM to conclude that no EIS was necessary for Revision 3 and a FONSI was issued. It is important to note that this case challenges OSM's decision to prepare an SEA, rather than the initial decision of whether to prepare an EIS. As noted by the Seventh Circuit, "the decision to supplement is made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action." *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).

17

OSM's decision that no EIS was necessary can be overturned only if the Court determines that it was arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir.), *cert. denied*, 515 U.S. 1159 (1995). OSM's decision must be "reasonable under the circumstances" when viewed "in the light of the mandatory requirements and the standard set by NEPA." *Id.* at 1519. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990). The Court may not substitute its judgment of the environmental impact of Revision 3 to NCC's permit for the judgment of OSM, assuming that OSM has adequately studied the issue. *Kelley*, 42 F.3d at 1518. The Court's role is to determine whether OSM "has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." *Id.* at 1518-1519; *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) ("Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results."). It is well settled that administrative decisions should be set aside "only for substantial procedural or substantive reasons as mandated by statute ..., not simply because the court is unhappy with the result reached." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).

18

Plaintiffs raise the following arguments regarding OSM's NEPA analysis of Revision 3: (1) OSM's analysis of alternatives is flawed; (2) OSM failed to take a hard look at the issues regarding sediment basin DNB-8; (3) OSM failed to designate the mining as one that would normally require the preparation of an EIS under OSM's guidelines; (4) OSM erroneously issued a FONSI when the SEA demonstrates that Revision 3 will have significant impacts on the environment; (5) OSM failed to provide a public notice and comment period on the SEA and FONSI; and (6) OSM failed to consider all reasonably foreseeable impacts. The Court will address these arguments in turn, noting that most of them were raised and rejected in the first lawsuit.

B.     Consideration of Alternatives

The plaintiffs complain that OSM's alternatives analysis is insufficient and constitutes consideration of a single, illegal alternative. Plaintiffs assert that OSM arbitrarily and capriciously failed to select Alternative 3 (permit revision application disapproval) as its preferred alternative and that OSM neglected to consider the "very reasonable alternative" of ceasing the mining while remediation takes place, *i.e.*, implementation of Special Condition 17d. [Doc. 17 at pp. 16-18.]

The federal defendants contend that this argument is a reiteration of an argument previously rejected by this Court in the first case and that it should be similarly rejected in this case. NCC argues that OSM did not have the authority to shut down the mine pursuant to SMCRA and therefore did not have to consider that alternative for purposes of NEPA review [Doc. 55].

19

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Agencies are directed to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of those actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). Thus, an EA must include a discussion of alternatives and the environmental impacts of the proposed action and alternatives. 40 C.F.R. § 1508.9(b).

The SEA lists the following "decision alternatives":

> Alternative 1: Approval of the Revision Application - OSM may approve the permit revision application upon finding that the proposed operation, as submitted in the initial application, will meet the requirements of SMCRA and the Federal Program for Tennessee. OSM determined that the initial revision application did not meet the requirements of SMCRA and as such, this alternative will not be considered further.

> Alternative 2: Approval of the Revision Application with Modification - OSM may approve the permit revision application upon finding that the proposed operation, as modified through the technical review process, will meet the requirements of SMCRA and the Federal Program for Tennessee.

> Alternative 3: Permit Revision Application Disapproval - OSM may disapprove the permit revision application upon finding that the proposed operation will not meet the requirements of SMCRA and the Federal Program for Tennessee.

> Alternative 4: No Action - The Federal Program for Tennessee requires that OSM approve or disapprove a permit revision application for surface coal mining and reclamation operations. Accordingly, this alternative will not be considered further.

20

[AR at REV3-0077.]  The SEA also contains over nine (9) pages of discussion of the environmental impacts of Alternatives 2 and 3 [AR at REV3-0083 to -0092].  The Court concludes that this analysis is not arbitrary or capricious, particularly in light of the EA's intended purpose as "a *concise* public document" that "[b]*riefly* provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1) (emphasis added).  The Court will uphold an agency's "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Citizens Against Burlington*, 938 F.2d at 196.  The plaintiffs' argument is tantamount to a disagreement with OSM's selection of a preferred alternative, an insufficient basis for a NEPA challenge.  *See Slater*, 120 F.3d at 633.

C.     Sediment Basin DNB-8

The parties appear to agree that DNB-8 is a sediment pond that was constructed too close to a public road, too close to the stream buffer zone, and that a portion of it was constructed outside the permit area.  It appears that DNB-8 was built by NCC under an agreed order with the Tennessee Department of Environment and Conservation ("TDEC") and that it was built prior the time the SEA and FONSI were issued.  The plaintiffs complain that OSM failed to discuss the problems or foreseeable impacts of DNB-8 in the SEA and that OSM cannot forego NEPA analysis of DNB-8 by classifying it as an enforcement issue.

The federal defendants argue that OSM made a discretionary decision to handle the problems associated with DNB-8 as enforcement issues and that such decision was not

arbitrary or capricious. NCC likewise argues that OSM adequately considered the impacts of sediment basin DNB-8 during the integrated NEPA and SMCRA review and further that the SEA mentions the sediment pond several times.

Plaintiffs' argument is belied by the plain language of the SEA, which discusses the fact that DNB-8 had already been constructed and the perceived impacts of that sediment basin. Moreover, it appears that OSM has taken steps to remedy the problems of which plaintiffs complain through SMCRA enforcement measures. The Court does not find that this decision was arbitrary or capricious.

D.     Whether the Mining Operation Would "Normally" Require an EIS

Plaintiffs argue that OSM failed to designate the mining as one that would normally require the preparation of an EIS under OSM's guidelines. In support of this point, plaintiffs contend that the total disturbed acreage, *i.e.*, 1280 acres, and the revision to the transportation plan are both factors which warrant the preparation of an EIS.

Plaintiffs' argument relates to an OSM handbook guideline which lists action that "will normally require the preparation of an EIS," including "mining that would require a major change in existing coal transportation facilities" or approval of a mining and reclamation plan that:

> (a)     the environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity; and
> (b)     the area to be mined is 1280 acres or more ... ; and
> (c)     mining and reclamation operations will occur for 15 years or more.

[Doc. 3, Ex. 34.] The Court notes that this argument was raised and rejected in the first case. Plaintiffs' argument is based on a speculative assumption as to what the total disturbed acreage is "likely to be" in the future and a speculative assumption that "a new haulroad for taking out coal will have to be built." The Court declines to second-guess OSM's interpretation of its own guidelines based on plaintiffs' predictions of potential impacts.

   E.   Whether Issuance of the SEA and FONSI was Arbitrary and Capricious

   Plaintiffs next argue that OSM erroneously issued a FONSI when the SEA demonstrates that Revision 3 will have significant impacts on the environment. Specifically, plaintiffs argue that OSM failed to take a hard look at the impacts to the streams and aquatic biota and the use of polyacrylamides. NCC points out that plaintiffs declined to substantively challenge OSM's conclusions through SMCRA enforcement and instead seek a substantive review by this Court under NEPA.

   In reply [Doc. 82], plaintiffs' argument shifts to OSM failure to address the cumulative impacts of reasonably foreseeable connected actions, particularly the hydrologic consequences, of the entire mining operation. However, it appears that OSM has, by virtue of Revision 1, reevaluated the drainage control plan for the entire permit area. Moreover, with respect to the analysis of Revision 3, the adequacy of OSM's analysis must be determined by the scope of the proposed action. *See Weinberger*, 745 F.2d at 418 n.6 ("Although the duty to supplement may be a continuing one, that duty is practically limited by the nature and life cycle of the proposed project or action and the kind of change or new information involved."). In other words, OSM's scope of review of Revision 3 must

necessarily be limited to the reasonably foreseeable impacts of what Revision 3 will or will not do to the environment.

Review of plaintiffs' argument reveals that it is really a disagreement with OSM's conclusions. [*See* Doc. 17 at p. 25 ("OSMRE's assumptions that the <u>elimination</u> of all macroinvertebrates in these reaches of Dan Branch are temporary is suspect."), p. 27 ("OSMRE had an obligation under NEPA to independently study the issues ... and not just brush them off.")] The SEA discusses both impacts to the streams and the use of polyacrylamides. Plaintiffs' disagreement with OSM's conclusions is an insufficient basis to form a NEPA challenge, *see Slater*, 120 F.3d at 633, and NEPA does not require the Court to engage in a substantive disagreement with OSM's experts. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). The Court does not find that OSM's decision to issue the SEA and FONSI was arbitrary or capricious.

F.    Notice and Comment Period

As with the first case, plaintiffs argue that OSM failed to provide a public notice and comment period on the SEA and FONSI. Plaintiffs argue that OSM should have made the SEA and proposed FONSI available for public review because the "action is, or is very similar to, one which normally requires an EIS." [Doc. 17 at p. 34, quoting 40 C.F.R. § 1501.4(e)(2).] Plaintiffs contend that OSM's refusal to do so violates the spirit and letter of NEPA's mandate to encourage public involvement in decisions affecting the environment.

However, as noted *supra* and in the first case, this is not an action that normally requires an EIS. Therefore, a public notice and comment period was not required. Because

a public comment period was not required, the failure to provide one cannot be considered arbitrary and capricious. As highlighted by the federal defendants and NCC, OSM did hold an informal SMCRA hearing for public comment on Revision 3 and considered the comments received in its review of Revision 3. Indeed, the AR contains the comments received in writing and in person and 21 pages of OSM's responses to those comments. [AR at REV3-0117 to -0137.] Based on the record, the Court simply cannot conclude that OSM failed to consider public input on Revision 3.

Plaintiffs respond that the public comment period and informal conference in June and July 2004 is not a substitute for advising the public of the decision to prepare an SEA prior to its completion on February 16, 2005, and release on March 6, 2005 [Doc. 82 at p. 18]. However, plaintiffs have not identified any authority requiring defendants to obtain further public input on a draft SEA. Accordingly, the Court does not find that the decision not to do so was arbitrary or capricious.

G.     Whether OSM Has Segmented Its NEPA Analysis

Plaintiffs' final argument is that OSM has impermissibly segmented its environmental analysis by looking at each permit revision separately and avoiding a comprehensive look at the significance of the environmental impacts. This argument, however, as noted by NCC, is undercut by plaintiffs' admission that OSM has reevaluated and approved the drainage control plan for the entire permit area [see Doc. 17 at p. 35, n.17]. In reply [Doc. 82], plaintiffs' argument on this point shifts to their assertion that Revisions 1 and 3 have added additional disturbed acres than assessed in the original EA and that OSM has failed to

sufficiently analyze the impacts of those additional disturbed acres. Ultimately, plaintiffs' argument is simply a substantive disagreement with OSM's conclusion that Revision 3 would result in no significant impacts on the environment, a decision the Court cannot overturn based only on disagreement with the outcome. As noted previously, NEPA does not mandate a specific result, only that OSM carefully considered the impacts of the proposed project. *Robertson*, 490 U.S. at 350; *Strycker's Bay Neighborhood Council, Inc.*, 444 U.S. at 227-28.

Based on the analysis set forth above, the Court concludes that plaintiffs are not likely to succeed on the merits of their claims. Therefore, the Court need not address the remaining factors and plaintiffs' motion for preliminary injunction will be denied.

## V.    Conclusion

For the reasons set forth above, the plaintiffs' motion for preliminary injunction will be denied, the defendants' motion for partial dismissal will be granted, and the defendants' motion to strike will be denied. An order reflecting this opinion will be entered.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE