IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| TENNESSEE CLEAN WATER NETWORK, *et al.*, | ) ) ) | |
|---|---|---|
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 3:05-cv-214 (VARLAN/GUYTON) |
| DIRK KEMPTHORNE, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

This is a civil action brought under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370(d), seeking declaratory and injunctive relief against the Office of Surface Mining, Reclamation and Enforcement (OSM). Plaintiffs challenge the adequacy of a Supplemental Environmental Analysis (SEA) conducted by OSM under NEPA. Plaintiffs also sue the National Coal Company (NCC) for breach of the Surface Mining Reclamation and Control Act (SMRCA) for construction of a sediment basin too close to a public road in an area Congress has determined is unsuitable for mining. Currently pending are motions for summary judgment of all three parties (Docs. 169, 172, and 174). For the reasons that follow, plaintiffs' motion will be denied, defendants' motions will be granted, and this action dismissed.

I.

*Introduction*

This is the second lawsuit filed in this Court against OSM challenging actions related to this mining operation. In the first lawsuit, *Save Our Cumberland Mountains, et al., v. Gale A. Norton, et al.*, No. 3:03-cv-462, four environmental groups challenged OSM's issuance of Permit No. 3116 to the Robert Clear Coal Corporation (RCCC) on June 30, 2003, to conduct contour, cross-ridge, and auger coal mining operations on Zeb Mountain. Plaintiffs in that case also challenged OSM's issuance of an Environmental Assessment (EA) and a Finding of No Significant Impact (FONSI) which were issued along with Permit No. 3116. The initial mining permit issued to RCCC was transferred to NCC, a defendant in this case, on November 8, 2004, as successor-in-interest Permit No. 3154.

In a Memorandum Opinion issued on February 3, 2005, this Court granted summary judgment in favor of OSM in No. 3:03-cv-462, concluding that the issuance of Permit No. 3116, as well as the accompanying EA and FONSI, was not arbitrary, capricious, or an abuse of discretion. The United States Court of Appeals for the Sixth Circuit affirmed in an opinion filed on June 29, 2006.

While No. 3:03-cv-462 was on appeal, on April 22, 2005, the instant action was filed by five non-profit organizations, Tennessee Clean Water Network, the Sierra Club, Appalachian Voices, the Southern Appalachian Biodiversity Project, and Save Our

2

Cumberland Mountains[1], who are challenging certain decisions of OSM related to Permit No. 3154 issued to NCC and claiming that NCC is in violation of SMRCA by maintaining a sediment basin too close to a public road. On October 4, 2005, this Court denied plaintiffs' motion for a preliminary injunction, upon concluding that plaintiffs were not likely to succeed on the merits of their claims. Many of the NEPA issues raised by the pending motion have been addressed in No. 3:03-cv-462, and in the earlier Memorandum Opinion in the instant case, wherein plaintiffs' motion for a preliminary injunction was denied.

## II.

### *Factual Background*

On June 3, 2004, OSM issued surface mining Permit No. 3116 allowing RCCC to conduct multi-seam, cross-ridge, contour-shaping mining on 2,107 acres in Campbell County, Tennessee. The first six months of mining in what is known as the Dan Branch Watershed led to excessive sedimentation of Dan Branch. Soon after the mining began, RCCC, OSM, and the Tennessee Department of Environment and Conservation (TDEC) recognized that spoil dumped on the out-slopes in prior decades by other mining companies was sliding downhill, contributing to the excess sedimentation in the Dan Branch Watershed. AR REV. 3-0152.

---

[1]Plaintiff Save Our Cumberland Mountains was voluntarily dismissed on June 22, 2006 [Doc. 143].

On December 29, 2003, OSM required RCCC to submit a revised sediment control plan for the Dan Branch Watershed and to re-evaluate the approved drainage control plans for the remaining watersheds in the permit area. *See* AR REV 3-1049-1050. RCCC could continue to mine in Dan Branch pending review, but was not allowed to initiate mining in any new watershed until the drainage control plans for such new watersheds had been re-evaluated and approved by OSM. *Id.* Also on December 29, 2003, OSM issued an Ordered Revision requiring revision of the drainage control plan for the Dan Branch Watershed and re-evaluation of the drainage control plans for the remaining watersheds in the permit area. AR REV 3-1048. OSM determined that the required revisions to the drainage control plan for Dan Branch Permit No. 3116 were considered a significant revision requiring public notice. AR REV 3-0007. Over 100 persons were in attendance at an informal conference at Cove Lake State Park on July 1, 2004. AR REV 3-0083.

On November 8, 2004, OSM approved the transfer of the mining permit from RCCC to NCC and issued Successor-in-Interest Permit No. 3154. A revised Successor-in-Interest Permit was issued December 6, 2004. NCC accepted all the liabilities and obligations of RCCC. On December 6, 2004, OSM issued a Revised Successor-in-Interest Permit No. 3154 to NCC. This Revised Permit included Special Condition 17d and a finding that the mining company was out of compliance with the mining plan, revised Successor-in-Interest Permit No. 3154, and Revised Finding. Doc. 3, Attachment 6.

On January 2, 2004, RCCC submitted an application for Revision No. 3, proposing measures to improve sediment control in Dan Branch, including sediment ponds DNB-7

(which had already been constructed to appease TDEC) and DNB-8 (also requested by TDEC to capture haul road drainage, but not yet constructed) in a rock toe buttress for slide stabilization. AR REV 3-1056-1058. At the request of the Sierra Club, OSM determined that the revision would be deemed significant under SMRCA and that public hearings would be conducted. OSM also agreed to review the original EA/FONSI and amend it if the proposed revision would result in impacts not previously considered. AR REV 3-0980-0981.

At about the time that OSM began its review of the application, TDEC ordered RCCC to implement additional drainage control measures, including sediment pond DNB-8. TDEC's order required construction of DNB-8 within 30 days, by August 19, 2004, even though OSM had not yet approved RCCC's revision application. RCCC constructed DMB-8 as ordered, before NCC took over operations at the site. OSM acknowledges that RCCC was ordered by TDEC to build DNB-8 even if it meant doing so without prior OSM approval. *See* SEA at III-9. AR REV 3-0076, 0084 ("... per orders of TDEC, DMB-7 and DMB-8 had already been constructed.").

Also, as part of the Director's Order and Assessment, TDEC required RCCC to implement a chemical treatment plant for solids removal. AR REV 3-1045. On May 24, 2004, TDEC approved the chemical treatment plan proposed by RCCC in response to TDEC's order. AR REV 3-0691. Revision 3 included the proposed chemical treatment plan, as required under SMRCA. *See* AR REV 3-0067.

On June 21, 2004, RCCC submitted to TDEC its Aquatic Resource Alteration Permit (ARAP) application for relocation of a portion of Dan Branch as proposed in Revision 3.

TDEC then began its review process of the ARAP application which OSM considered in its review of the Revision 3 application. *See* AR REV 3-0159 to -0165.

OSM received permits from the Department of the Interior Fish and Wildlife Service (FWS) on May 4, 2004, July 23, 2004, September 29, 2004, and October 19, 2004. OSM required RCCC to include provisions in the permit revision which would address FWS's concerns. AR REV 3-0146, -0147, -0149, -0150. On October 19, 2004, FWS informed OSM that it was satisfied that RCCC's plans for Revision 3 relating to "the Fish and Wildlife Protection and Enhancement Plan adequately address[ed] [the] concerns" of FWS.

On October 21, 2004, OSM notified RCCC that the application for Revision 3 was technically adequate. AR REV 3-0115 to -0116.

On February 16, 2005, OSM issued its Findings, Supplemental Cumulative Hydrologic Impact Assessment (SCHIA), SEA, and FONSI relating to Revision 3. AR REV 3-0066 to -0094. OSM notified NCC of the approval of Revision 3 by letter dated February 28, 2005. By letter dated March 2, 2005, OSM notified those agencies, organizations, and individuals who had submitted comments regarding proposed Revision 3 of the approval and issuance of the SEA and FONSI. AR REV 3-0018, -0020 to -0022.

The Order for Revision dated December 29, 2003, in addition to requiring a permit revision relating to Dan Branch, also required re-evaluation of the approved drainage control plans for the remaining watersheds within the permitted area. *See* AR REV 3-1049 to -1050. Revision 1 is NCC's partial response to this additional requirement. NCC submitted the application for Revision 1 on January 25, 2005. *See* AR REV 1-0023. On March 23, 2005,

OSM completed its review of Revision 1 and approved it as a "minor revision that will not result in any additional impacts." AR REV 1-0010 to -0011, -0025 to -0026C.

III.

*Plaintiffs' Claims*

For purposes of analysis, plaintiffs' claims can be divided into two main groups: (1) NEPA claims relating to Revision 3 and its significant impacts, particularly the illegality of Sediment Basin DNB-8, the alleged inadequacies of the alternatives analysis, and failure of OSM to take a hard look at the illegal location of DNB-8 and the SMRCA violation and NCC's violation of SMRCA (Counts II-IX and XII); and (2) claims that OSM failed to assess under NEPA the impact of known connected actions and other proposed changes to the permit, including Revision 1, the need for sediment control measures along the haul road, and the fact that had these impacts been included in the SEA, OSM's own guidelines would have required an Environmental Impact Statement (EIS) and Appropriate Public Notice and Comment (Counts X, XI and XIII-XVI).[2]

---

[2] Count I, dealing with OSM's failure to enforce Special Permit Condition 17d, was dismissed in this Court's Memorandum Opinion on October 4, 2005 [Doc. 116]. Plaintiffs voluntarily dismissed Count XXII, asserting a violation of the Clean Water Act. *See* Doc. 168.

IV.

*Standard of Review*

This Court has jurisdiction to review NEPA claims pursuant to the Administrative Procedures Act, 5 U.S.C. § 704. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Issuance of an environmental assessment, here the SEA, constitutes a "final agency action" for purposes of review under the Administrative Procedures Act. *Southwest Williamson County Community Assn., Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001). This Court's review of a federal agency decision under the APA is a review of the Administrative Record and a determination, based on the Administrative Record, of whether that decision was arbitrary and capricious. 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, finding, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). *See Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir.), *cert. denied*, 506 U.S. 953 (1992). This is a deferential standard of review that presumes the validity of agency actions. *See Chemical Manufacturers Assn. v. National Resources Defense Council, Inc.*, 470 U.S. 116, 131 (1985).

NEPA is "our basic national charter for protection of the environment," 40 CFR § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare

8

of man." 42 U.S.C. § 4321. NEPA does not mandate a specific result; NEPA requires only that the agency follow the necessary process in assessing the environmental effects of such projects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980).

NEPA requires all federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *Southwest Williamson County Assn.*, 243 F.3d at 274 n.3. The NEPA regulations specifically provide that an agency may first prepare an environmental assessment (EA), a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 CFR § 1508.9. Thus, the regulations instruct that an agency, after preparation of an EA, may prepare either an EIS *or* a FONSI. In the present case, the SEA led OSM to conclude that no EIS was necessary for Revision 3 and a FONSI was issued. This case challenges OSM's decision to prepare an SEA, rather than the initial decision of whether to prepare an EIS. The United States Court of Appeals for the Seventh Circuit has noted that, "the decision to supplement is made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action." *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).

OSM's decision that no EIS was necessary can be overturned only if the Court determines that it was arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir.), *cert. denied*, 515 U.S. 1159 (1995). OSM's decision must be

"reasonable under the circumstances" when viewed "in the light of the mandatory requirements and the standards set by NEPA." *Id.* at 1519. The Court may not substitute its judgment of the environmental impact of Revision 3 to NCC's permit for the judgment of OSM, assuming that OSM has adequately studied the issue. *Kelley*, 42 F.3d at 1518. The Court's role is to determine whether OSM "has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." *Id.* at 1518-19; *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) ("Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results."). It is well settled that administrative decisions should be set aside "only for substantial procedural or substantive reasons as mandated by statute ... not simply because the Court is unhappy with the result reached." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont & Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978)).

V.

*Analysis*

To clarify plaintiffs' multiple complaints about the administrative actions that took place in this case, it is helpful to separate them into the following categories: (1) the exclusion of Special Condition 17(d); (2) NCC's Permit Revision 3; and (3) NCC's Permit Revision 1. The Court will consider each in turn.

(a) Special Condition 17(d).

On December 6, 2004, OSM issued a revised Successor-in-Interest Permit which included several special conditions, including Condition 17(d). Special Condition 17(d), which is the basis of plaintiffs' SMRCA claim, states as follows:

> Completion and implementation of OSM Permit No. 3116, Ordered Revision No. 3, Revision of Drainage Control Plan for Dan Branch Watershed, before mining activities resume.

[Doc. 53, Ex. B]. Thus, Special Condition 17(d) would have required the cessation of mining activities while the revision of the drainage control plan for the Dan Branch Watershed was being performed. OSM subsequently determined that Special Condition 17(d) was an administrative error and should not have been included in the revised transfer document. OSM attempted to correct the error by revising the document on March 3, 2005. However, the transfer decision had been administratively appealed and the administrative law judge (ALJ) determined that OSM could not amend the decision while it was on appeal. Thus, on June 23, 2005, the ALJ remanded the transfer decision to OSM to permit the revision of

11

Special Condition 17(d). On June 30, 2005, OSM revised and reissued the permit transfer decision without Special Condition 17(d).

The Court finds that it was not arbitrary and capricious for OSM to delete Special Condition 17(d). Revisions to NCC's permit had already been made proposing a method to limit and remediate the damage and sedimentation in the Dan Branch Watershed, particularly through Revision 3. It is undisputed that mining had never ceased under Permit No. 3116. Further, under 30 CFR § 843.11, OSM lacked the regulatory or factual basis to require NCC to stop mining pending processing and implementation of Revision 3. Accordingly, the defendants are entitled to summary judgment with respect to Special Condition 17(d).

(b) Revision 3.

Revision 3 is at the heart of the plaintiffs' claims. It relates primarily to OSM's order for RCCC, now NCC, to revise the drainage control plan for the Dan Branch Watershed. Revision 3 proposed the following actions:

> This revision authorizes changes to the drainage control plan in the Dan Branch Watershed portion of the permit area. These changes include: (1) the construction of two new temporary sediment basins (DNB-7 and DNB-8), a temporary sediment trap, and temporary pipeline and diversion ditch to provide sediment control for run-off from a portion of Haul Road No. 1 and an existing landslide; (2) the temporary use of flocculent and coagulant products to treat water in the sediment basins; (3) construction of a rock buttress and the associated relocation of a portion of Dan Branch in order to stabilize an existing landslide; (4) stabilizing basin DNB-3 spillway to prevent further erosion; (5) the addition of two permanent sediment basins (DNB-5 and DNB-6) on the mine bench area to improve sediment control from the mining area; and (6) minor modifications of the construction plan for various previously approved basins in the Dan Branch Watershed. This revision

> necessitates an incidental change to the permit boundary adding an additional 19.6 acres to the permit area, of which 15.6 acres would be disturbed.

AR REV 3-0067. On February 16, 2005, OSM issued its Findings, a Supplemental Cumulative Hydrologic Impact Assessment (SCHIA), a Supplemental Environmental Assessment (SEA), and FONSI related to Revision 3. Plaintiffs claim that, in the issuance of the SEA and FONSI, OSM's analysis of alternatives was flawed; OSM failed to take a hard look at issues regarding sediment basin DMB-8; OSM failed to designate the mining as one that would normally require the preparation of an EIS under OSM's guidelines; OSM erroneously issued a FONSI when the SEA demonstrated that Revision 3 will have significant impacts on the environment; OSM failed to provide a public notice and comment period on the SEA and FONSI; and OSM failed to consider all reasonably foreseeable impacts.

With respect to the alternatives analysis, plaintiffs contend that it was simply insufficient and constituted consideration of a single, illegal alternative. NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended course of action in any proposal which involved unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (Agencies are directed to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of those actions upon the quality of the human environment.") 40 CFR § 1500.2(e). Thus, an EA must include a discussion of alternatives and the environmental impacts of the proposed action and alternatives. 40 CFR § 1508.9(b).

The SEA at issue listed the following "decision alternatives":

Alternative 1: Approval of the Revision Application - OSM may approve the permit revision application upon finding that the proposed operation, as submitted in the initial application, will meet the requirements of SMRCA and the Federal Program for Tennessee. OSM determined that the initial revision application did not meet the requirements of SMRCA and as such, this alternative will not be considered further.

Alternative 2: Approval of the Revision Application with Modification - OSM may approve the permit revision application upon finding that the proposed operation, as modified through the technical review process, will meet the requirements of SMRCA and the Federal Program for Tennessee.

Alternative 3: Permit Revision Application Disapproval - OSM may disapprove the permit revision application upon finding that the proposed operation will not meet the requirements of SMRCA and the Federal Program for Tennessee.

Alternative 4: No action - The Federal Program for Tennessee requires that OSM approve or disapprove a permit revision application for surface coal mining and reclamation operations. Accordingly, this alternative will not be considered further.

AR REV 3-0077.

The SEA contains over nine pages of discussion of the environmental impacts of Alternatives 2 and 3. AR REV 3-0083 to -0092. It discussed the environmental impacts of the proposed alternatives, including the impacts of approving the permit revision with modification and the impacts if the application were denied. AR REV 3-0078 to -0092. This analysis included a discussion of the impacts to topography, geology, and soil; vegetation, land use, and esthetics; hydrology; fish and wildlife resources and threatened or endangered species; cultural and historic resources; air quality; socio-economics; public safety; and cumulative hydrologic and terrestrial impacts. AR REV 3-0083 to -0092. The Court does

not find that this discussion was insignificant, particularly in light of NEPA regulations providing that an EA, or an SEA, was intended to be "a *concise* public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 CFR § 1508(a)(1) (emphasis added). The Court finds that OSM's discussion of the alternatives was reasonable and the agency discussed them in reasonable detail. That the plaintiffs would have preferred another alternative is an insufficient basis for a NEPA challenge in this instance.

It is undisputed that the sediment pond known as DNB-8 was constructed too close to a public road, too close to the stream buffer zone, and that a portion of it was constructed outside the permit area. This sediment pond was built by NCC's predecessor, RCCC, at the direction of TDEC, and OSM has acknowledged that TDEC required RCCC to build the pond prior to obtaining OSM approval.

The defendants contend that OSM made a discretionary decision to handle the problems associated with DNB-8 as enforcement issues, and that such a decision was not arbitrary or capricious. OSM considered the impacts of sediment basin DNB-8 during the integrated NEPA and SMRCA review and, further, the SEA mentions the sediment pond several times. The SEA discusses the fact that DNB-8 had already been constructed and was aware of the perceived impacts of that sediment basis. It also appears that OSM has taken steps to remedy the problems of which plaintiffs complain through SMRCA enforcement measures. The Court cannot conclude that OSM's decision to treat sediment basin DNB-8 as an enforcement measure was arbitrary or capricious.

Plaintiffs contend that OSM failed to designate the mining as one that would normally require the preparation of an EIS under OSM's guidelines. They claim that the total disturbed acreage (1,280 acres) and a revision of the transportation plan are both factors which mandated the preparation of an EIS. Plaintiffs' argument is based on an OSM guideline which lists action that "will normally require the preparation of an EIS," including "mining that would require a major change in existing coal transportation facilities" or approval of a mining and reclamation plan that:

> (a) the environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activities; and
>
> (b) the area to be mined is 1,280 acres or more ...; and
>
> (c) mining and reclamation operations will occur for 15 years or more.

Doc. 3, at Ex. 34. This argument was raised and rejected in the first case and also previously in this case. The argument is based on speculation as to what the total disturbed acreage is "likely to be" and the speculation that a new haul road taking out coal will have to be built. As in the previous Memorandum Opinion, this court declines to second-guess OSM's interpretation of its own guidelines based on plaintiffs' predictions of potential impacts. Plaintiffs contend that it was arbitrary and capricious for OSM to issue a FONSI when plaintiffs claim that Revision 3 will have significant impacts on the environment. Plaintiffs argue that OSM failed to take a hard look at the impacts to the streams and aquatic biota and the use of polyacrylamides. However, OSM, by virtue of Revision 1, re-evaluated the drainage control plan for the entire permit area. The SEA discusses both impacts to the

16

streams and the use of polyacrylamides. Plaintiffs' disagreement with OSM's conclusion does not compel the Court to find that the issuance of the FONSI was arbitrary and capricious.

Plaintiffs next contend that OSM failed to provide a public notice and comment period on the SEA and FONSI. Plaintiffs claim that the SEA and proposed FONSI should have been made available for public review because the "action is, or is very similar to, one which normally requires an EIS." *See* 40 CFR § 1501.4(e)(2). However, as noted previously, in this case and the first case this was not an action that normally requires an EIS and therefore a public notice and comment period was not required. As the defendants pointed out, OSM did hold an informal SMRCA hearing for public comment on Revision 3 and considered the comments received in its review of Revision 3. The administrative record contains comments received in writing and in person and 21 pages of OSM's responses to those comments. AR REV 3-0117 to -0137. OSM was not required to obtain any further input than it did on a draft SEA. Accordingly, the Court does not find that the decision not to do so was arbitrary or capricious.

Plaintiffs further argue that OSM impermissibly segmented its environmental analysis by looking at each permit revision separately and avoiding a comprehensive look at the significance of the environmental impacts. However, this is disputed by OSM's re-evaluation and approval of the drainage control plan for the entire permit area. The Court finds nothing arbitrary and capricious about the manner in which OSM "segmented" its environmental analysis. The record makes it clear that OSM carefully considered the

17

impacts of the proposed project not only in the Dan Branch Watershed but also in the entire area to be affected.

(c) Revision 1.

OSM's letter for revision dated December 29, 2003, in addition to requiring a permit revision relating to Dan Branch, also required re-evaluation of the approved drainage control plans for the remaining watersheds within the permitted area. Revision 1 was NCC's partial response to this added requirement. AR REV 1-0023. Revision 1 included only a re-evaluation of the drainage control plans in some of the watersheds other than Dan Branch. On March 23, 2005, OSM completed its review of Revision 1 and approved it as a "minor revision that will not result in any additional environmental impacts." AR REV 3-0010 to -0011, -0025 to -0026C. With respect to these other watersheds, there was no change in the impacts analyzed in the original EA and CHIA. The Court finds that OSM's determination that Revision 1 did not require supplementation of the NEPA documents was not arbitrary or capricious.

VI.

*Claims Against NCC*

Plaintiffs contend that NCC violated SMRCA by constructing DNB-8 in an illegal area, too close to a highway and a stream. The Court notes that the DNB-8 sediment pond was constructed by NCC's predecessor, RCCC, and at the direction of TDEC. Moreover,

it was constructed as a remedial method to minimize the adverse impacts of the mining to the environment. OSM has chosen to handle the violation as an enforcement issue. Plaintiffs brought this claim under 30 U.S.C. § 1270(a)(1), which does not authorize civil penalties. Rather, the statute only allows a citizen to file suit in order to compel compliance. There is no dispute that NCC has complied and continues to comply with the notices of violation issued to it and its predecessor, RCCC. There is no basis for a citizen suit under SMRCA against NCC.

VII.

*Conclusion*

In light of the foregoing, defendants' motions for summary judgment [Docs. 169 and 172] are GRANTED, and plaintiffs' motion for summary judgment [Doc. 174] is DENIED. This action is hereby DISMISSED.

Enter Judgment Accordingly.

s/ Thomas A. Varlan  
UNITED STATES DISTRICT JUDGE